Milligan, J.,
delivered the opinion of the Court.
This is a bill filed in the Chancery Court, at Lebanon, on the 21st of June, 1859, by the complainants, as administrators of Thomas E. Bonner, dec’d, against *634 Bettie Bonner, widow of E. R. Bonner, dec’d, Wm. E. T. Bonner, minor, and his guardian, Allen Dillard, and Alexander R. Eanville, administrator of E. R. Bonner, dec’d, to sell the slaves or real estate of the intestate, Thomas E. Bonner, dec’d, to pay debts, with a prayer for general relief.
It appears from the record, that Thomas E. Bonner died intestate, in January, 1857, leaving his widow, Minerva M. Bonner, and an only son, Ed. R. Bonner, his distributees. His widow, qualified as administratrix on his estate; and sometime thereafter, intermarried with the complainant, Brice Curd. The son, Ed. R. Bonner, after the death of his father, also died intestate, leaving a widow, Bettie Bonner, and an only child, Wm. E, T. Bonner, surviving, as his distributees. A. R. Fanville qualified as administrator on his estate, and Allen Dillard was appointed guardian of the infant child. Curd and wife, in May, 1859, made a settlement with the Clerk of the County Court, in which they were properly charged with all the assets of the estate, including an account of sales, and the proceeds of two old slaves, which had been applied in the payment of debts; and after crediting them with all lawful disbursements, there appears, from the report of the Clerk, to be $1,921.11 outstanding debts against the estate, for the payment of which there are no personal assets in the hands of the administrator.
The bill seeks to sell the real estate in preference to the slaves, if such a sale can lawfully be ordered, without prejudice to the minors; but if not, then it asks' the sale of all the slaves, and an order of Court ap *635 propriating so much of the proceeds as may he necessary to pay the debts of the estate. The minors are all brought in by service of process, and answer, by their guardians, jointly with the other defendants. In the answer, it is insisted, if any portion of the sla.ves are sold to pay debts, that all shall be sold, and the proceeds, after the payment of the debts, be divided, according to law.
On the 4th of January, 1860, by an interlocutory order of the Court, this cause was referred to the Master, to report, if a sale was necessary to pay the debts of the estate. The Master was directed to report to that Term of the Court, which was done. And, in his report, he states, that he had “examined the settlement and inventory of the administrators, and found that the chattels, property, and other assets, coming to the hands of the administrators, are insufficient to pay the debts of the estate, and that the slaves should be sold to pay debts, and for distribution among the parties. That all the parties desire a sale of the property, and that no distinction can be. made between the slaves, selecting any particular ones for sale; and that a sale of the entire slaves should be made.”
The amount of the indebtedness is set out in this report; and on the same day it was filed, it was regularly, without exception, in all things confirmed, and a decree pronounced directing the sale of all the slaves.
Pursuant to this decree, the Master, on the 11th of February, 1860, proceeded to sell all the slaves; and made his report in proper form, setting out the names of the slaves sold to each purchaser, and the price at which *636 each was struck off, which was, on the 4th of July, 1860, regularly confirmed, without exception, by the Chancellor. But in the decree of the Court, confirming the report of sale, the title is not formally divested and vested in the purchasers. But it appears that the slaves were all delivered to the purchasers, at the date of the Master’s sale, and that they continued to hold the possession, without complaint, until about the time their emancipation, under the amendments to the Constitution, ratified on the 22d of February, 1865, was formally declared.
No further action appears to have been taken in this cause from the July Term, 1860, at which the Master’s sale was confirmed, until the October Term, 1865, when R.. E. Thompson filed his petition; and thereafter, on the 12th of October, 1865, his amended and supplemental petition, alleging that he purchased three of the slaves — Nancy, and her two children, Jach and Dallas —at the price of two thousand dollars, — four hundred of which were paid in hand, and his note, with security, executed, payable in twelve months from date, for the remainder. The petitioner admits, that at the date of the sale, the slaves were placed in his possession; but says, since the motion was entered against him for judgment on the note, he has discovered, that the interlocutory decree, ordering the sale of the slaves, was null and void, on the ground that there was no evidence upon which the Chancellor could predicate a decree, directing the sale of the slaves for the payment of debts, or for distribution; and, that as the legal title remained in the distributees of Thomas E. Bonner, dec’d, they *637 must bear the loss effected by the alteration in the Constitution.
To the original and supplemental petition, the defendants answer, and either deny or avoid all the equities therein set up and relied upon. The Chancellor held the sale valid, and pronounced judgment on the note, against the petitioner and his securities, for the unpaid purchase-money; from which this is an appeal, in error, to this Court.
Under this state of facts, two controlling questions are submitted for our determination:
1st, Was the sale of the slaves regular and valid, and operative to clothe the purchaser with a good title, without a formal decree of the Chancellor, divesting and vesting the title?
2d, If the title or property fails, without the default, or misconduct of the purchaser, can there be a recovery on his note?
The primary object of the proceeding is, to raise the means necessary to discharge the debts of the estate; and in the bill, as before shown, it is alleged, that if the slaves must be resorted to for that purpose, all should be sold; and, after paying the debts, the remaining proceeds distributed, according to law. The bill is sworn to, and the application made under the Code, sections 2246-7-8. The proceedings are formal, and no exception is taken on that account; but the ground of objection is rested on the insufficiency of the evidence upon which the Master predicated his report. No witnesses appear to have been examined; and nothing is shown in the report to have been before the Master, *638 except the inventory and the settlement of the administrator with the Clerk of the County Court. Is this sufficient? Does it so conform to the requirements of the Act of the Assembly, as to confer the jurisdiction on the Court to convert the property of the estate?
By the Code, sec. 2248, it is declared: “If on the hearing of the petition, and any evidence that may be adduced, the Court shall be satisfied of the truth thereof, and that such slave, or slaves, ought to be sold, it may order and direct the executor or administrator to do so.”
In the case of Creppin, adm’r, vs. Creppin et al., 1 Head. 128, the rule, as extracted from that opinion, may be stated, that, before a decree to sell lands or slaves, to pay debts, there shall be an account with the administrator of the assets of the estate, received by him, or which he ought to have received, and of such bona fide debts and charges upon the estate as he may have paid; and such Iona fide debts and charges as remain unpaid and outstanding against the estate. These facts must be established by proper evidence, and to the satisfaction of the Chancellor. In this case, the Master appears to have predicated his report upon the former settlement made by the administrator with the Clerk of the County Court. By Statute, (Code, sec. 2305,) as well as former decisions of this Court, a settlement made by an administrator, or an executor, with the Clerk of the County Court is prima facie evidence in favor of the accounting party; and when it is formal, in detail, and accurate in all its parts, as the one in question appears to be, and withal unexcepted to, we think it may so far constitute the basis of the Master’s report, if otherwise unexceptionable, *639 as ‡0 authorize the Chancellor to direct a sale of slaves to pay the debts of the estate. All that is required is the presence of such facts in the Master’s report, sustained by legal evidence, as will satisfy the Chancellor of the justness and necessity of the application. In this case, it is assumed in the decree confirming the report and directing the sale, that “it appears to the Court that a sale of the slaves should be made for the purpose of paying debts, and for distribution.”
Under such circumstances, this Court would presume the presence of such facts as are necessary to uphold the decree of the Chancellor directing the sale, especially if it appeared from the whole record, as it most clearly does in this case, that the sale was manifestly for the interest of the minor children.
The sale of more of the slaves than were necessary to pay the debts, seems to have been predicated upon the desire of all the parties, and the peculiar and obvious condition of the two estates, and the number and ages of the slaves. True, the minors, nor their guardians ad litem, or otherwise, could give no consent to the sale; but when this Court can clearly see the action of the Chancellor was for the interest of the minors, at the time of the sale, it will not, on the application of the purchaser, and without complaint on the part of the infants, interpose to set the sale aside.
The second objection under this head, is rested upon the fact that there is no formal decree vesting the purchaser with title to the slaves. There is nothing in this objection. In Maryland, in the case of The State, for the use, &c., vs. Krebs, 6 Harris & Johnson, 36, it is *640 held, “that the mutation of an estate from real to personal, may be determined to be complete when the commissioner’s sale is ratified by the Court, and the purchaser has complied with the terms of it, by paying the money, if the sale is for cash; or by giving bond to the representative, if the sale is on credit.” This opinion has been followed by our own Court. In the case of Elizabeth Henderson vs. James B. Reid et al., it was announced; and again, in the case of James B. Jones vs. Joseph T. Walkup et al., 5 Sneed, 135, the Court say: “It is not the decree divesting title, which effects the change in the character of the property, from realty to personalty, but the perfection of the sale, by a compliance with its terms on the part of the purchaser, and its confirmation by the Court to which it is reported. This act of the Court completes the contract, and the nature of the property and rights of the parties are instantly changed. The purchaser is entitled to the land, and the former owner to the money. It is different before confirmation, because the sale is incomplete.”
It follows, therefore, as a corollary, if a Master’s sale, after a compliance with its terms, and confirmation by the Court, operates to vest the purchaser with a right to real estate, much more, under like circumstances, would it be effective to clothe the purchaser of a slave with the right to the property.
In this case, the sale was regular, and free from all imposition or fraud, and after the delivery of the property, and the regular confirmation of the sale, operated without a divestiture of title, to vest the purchaser with a Valid title to the slaves.
*641 The answer to the first proposition involves a complete solution of the second. The right of property being fixed in the purchaser, accompanied with the actual possession, he must bear the loss of the property, no matter how it occurs, whether from death or otherwise. And this would be the case, according to the adjudications of this Court, even before confirmation. In the case of Newman and Wife vs. Fred Sloan et al., (Manuscript opinion by Judge Wright,) the Court say: “As to the other question, at whose risk this slave was between the sale by the Master and its confirmation by the Court, we are aware of no case involving the sale of personal estate in which it has been directly and authoritatively decided that the casualties which may befall the property between the sale and confirmation, must be borne by the original owners, and not the purchasers.” Potter vs. Coward, Meig’s Rep., 22, 27, is also an authority directly on this point. There, it was held, that a slave sold at a Master’s sale, was at the risk of the purchaser. And in the manuscript opinion above cited, the Court say: “To hold otherwise, would, it seems to me, be, to give no effect whatever, to the sale; and must lead to great uncertainty and confusion, and operate injuriously upon sales of this character.”
Other authorities might be produced to this same point; but we deem it altogether unnecessary to burden this opinion with them. The fact, that in this case, the slaves were lost to the purchaser on account of the change in the Constitution of the State, can make no difference. The destruction of the institution of slavery *642 was the inevitable result of the great contest through which we have just passed. The sword was the arbiter; and the incidental prize, the institutitution of slavery. In the conflict it was lost; and the people of the States have only registered the decision, as a part of their fundamental law. Individual hardships result, hut they must be borne, as other great public calamities, by those upon whom they fall.
Affirm the decree of the Chancellor.